## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

Norman Michael Roberts,     )
     Petitioner,         )
                          )
v.                       )       1:20cv1011 (LO/MSN)
                          )
Harold Clarke,           )
     Respondent.       )

### MEMORANDUM OPINION

Norman Michael Roberts ("Roberts" or "petitioner"), a Virginia inmate proceeding pro se, filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his August 26, 2016 convictions for manufacturing methamphetamine and conspiracy to manufacture methamphetamine in the Circuit Court of Spotsylvania County. [Dkt. No. 1]. The respondent has filed a Rule 5 Answer and a Motion to Dismiss, with supporting briefs and exhibits. [Dkt. No. 10, 11]. On November 2, 2020, the petitioner was given the opportunity to file responsive materials pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) and Local Rule 7(K) to the motion to dismiss and Roberts has responded. [Dkt. No. 17]. Accordingly, this matter is now ripe for disposition. For the reasons that follow, the Court has determined that respondent's Motion to Dismiss will be granted, and the petition will be dismissed with prejudice.

### I. Background

A jury trial was held on June 14, 2016, Roberts was convicted of manufacturing methamphetamine and conspiracy to manufacture methamphetamine. The trial court imposed the jury's sentences of 20 years' in prison for manufacturing methamphetamine and 10 years' in prison

for conspiracy to manufacture. (Case Nos. CR151446 and 1447). The sentencing order was entered on August 26, 2016. Roberts appealed his convictions to the Court of Appeals of Virginia, challenging the admissibility of records introduced by the Commonwealth. The Court of Appeals granted the appeal and affirmed the conviction in an unpublished opinion on November 7, 2017, Roberts v. Commonwealth, Record No. 1535-16-2 (Va. Ct. App.), 2017 Va. App. LEXIS 276 (Ct. App. Va. Nov. 7, 2017)m and summarized the evidence at trial as follows.

> The evidence ... established that in April 2015, Detective James Wright of the Spotsylvania County Sheriff's Office received a tip from an informant that persons living at a house in the county were manufacturing methamphetamine. After corroborating the information in the tip, Wright began surveillance of the property, using a high-powered pair of binoculars and a camera with a large telephoto lens. Wright observed numerous persons, including appellant, walking around the outside of the house and walking between the house and a detached garage. The informant had reported that most of the methamphetamine was cooked in the garage. Wright once saw appellant with a green plastic bottle in his hand, which he swung back and forth as he walked in the yard. Wright testified that such a swinging action was consistent with manufacturing methamphetamine by the "one-pot" or "shake-and-bake" method. Deputy Ray Haney also saw appellant shaking a bottle in his hand as he paced in the yard.

> Wright later checked the names of appellant and other persons who lived in the house against the NPLEx database, which is used to track purchases of pseudoephedrine in real time. Wright testified that purchasers are required to show a photo identification and sign a log at the pharmacy where the purchase is being made. A person may buy three and six tenths grams each day or nine grams during a thirty-day period without a valid prescription, and when that limit is reached, further purchases are blocked until the next time period begins. Wright learned from the database that appellant and the other four persons living in the house had made numerous purchases and attempted purchases at pharmacies in the area between August 25, 2014 and June 30, 2015. As a registered user of NPLEx, Wright set up "alerts" to be notified by email when appellant or the other persons tried to buy pseudoephedrine, and he received two alerts during his investigation.

> A search warrant was executed on the property on May 20, 2015. The police found items in the house and yard that were consistent with the use and manufacture of methamphetamine, including bottles of starter fluid, cold packs, lithium batteries, coffee filters, and empty packages of pseudoephedrine. A soda bottle containing a white crystalline substance that appeared to be the remnants of a "meth cook" was found under a window in the rear of the garage. Appellant admitted to Wright that he had smoked methamphetamine "in the past," but he

2

denied making methamphetamine and claimed he had "no idea that [his housemates] were cooking meth in the garage."

After forensic analysis confirmed that two items seized from the property tested positive for methamphetamine and pseudoephedrine, Wright obtained arrest warrants for appellant and the other occupants and returned to the property on August 14, 2015. Appellant consented to a search of his bedroom. Wright discovered pieces of foil, which is used to store methamphetamine, and pieces of cut straw, which is used to ingest the substance, strewn around the room and in a purse that appeared to belong to appellant's girlfriend. In appellant's dresser, Wright located two-liter drink bottles, aluminum foil, a can of starter fluid, and a small blender that was covered in a white powder residue that appeared to be pseudoephedrine. Wright testified that these items were used to make methamphetamine.

Appellant made telephone calls from jail after his arrest, and recordings of three of the calls were played at trial. In one call to his girlfriend, appellant admitted buying methamphetamine from a neighbor but denied manufacturing it. In another call, appellant told his girlfriend he was glad she had not been involved in the offense because she did not have any photo identification and that he and the others were caught because they were "buyin' 'em and buyin' 'em and buyin' 'em." Appellant again claimed he had not "cooked" methamphetamine, but said he "knew what was going on" and "was getting high or whatever." In a third call to a female friend, appellant said he had thrown his life away "for basically nothing," and acknowledged he should not "go back to culinary arts" in the future. He also said he should get a lower charge because there was "only like 80 grams ... in the soda bottle."

One of the persons who lived at the house with appellant testified for the Commonwealth at trial. Aaron Webb said appellant was the only person in the house who knew how to make methamphetamine and that the drug was present in the house "[e]verywhere and all the time." Webb said he had purchased pseudoephedrine from pharmacies for appellant in exchange for methamphetamine. Webb acknowledged he had been charged for his participation in the scheme and said he hoped to benefit from testifying for the Commonwealth. He further said no promises had been made to him and that "it would not be very good for [him] at all" if he failed to testify truthfully.

Appellant testified at trial that he knew drugs were being used at the house, but he denied manufacturing or selling methamphetamine. He also denied purchasing pseudoephedrine and claimed the purchases and attempted purchases attributed to him on the NPLEx records had been made by someone using his identification, which he said had been stolen from him sometime after August 25, 2014. He said he used the cold packs found in his bedroom to cool his drinks and that the other items found in the dresser were his girlfriend's. Appellant acknowledged that he had fourteen prior felony convictions.

3

Roberts, 2017 Va. App. LEXIS 276, *2-6. The Supreme Court of Virginia denied Roberts petition for appeal on August 10, 2018 and denied his petition for rehearing on October 4, 2018. Robert v. Commonwealth, Record No. 180064.

Roberts filed a petition for a writ of habeas corpus in the Supreme Court of Virginia on September 30, 2019. Roberts v. Clarke, Record No. 191292 ("VSCT R. at __"). In the claim portion of his petition, Roberts simply asserted "6th Amendment ineffective assistance of counsel," (VSCT R. at 58), but the state habeas petition did not include specific claims or facts. Roberts filed a motion to amend his petition, after the statute of limitations had run, which the Supreme Court of Virginia denied on November 20, 2019. (VSCT R. at 139). The Supreme Court of Virginia denied Roberts motion for reconsideration on January 22, 2020. (VSCT R. at 142). The Supreme Court of Virginia dismissed the petition on February 19, 2020, stating it "is of the opinion that petitioner's claims assert conclusions or opinions without providing factual support and, therefore, do not support the issuance of a writ of habeas corpus. Penn v. Smyth, 188 Va. 367, 370-71 (1948)" (Id. at 143), and denied his motion for rehearing on May 14. 2020. (Id. at 147).

Roberts filed the instant federal habeas petition on August 17, 2020, and raises the following claims:

A. Roberts Counsel was ineffective for:

1. failing to prepare for trial by obtaining the search warrant affidavit used to justify the search of the petitioner's residence [Dkt. No. 1 at 47];
2. failing to prepare for trial by failing to investigate recorded jailhouse call evidence that was used against the petitioner [Id. at 53];
3. not investigating the NPLEX records used as evidence against the petitioner prior to trial [Id. at 56]; and
4. failing to do basic legal research and possess knowledge of law that pertains to the petitioner's case. [Id. at 59].

B. The Commonwealth violated the petitioner's due process rights by

4

(1) knowingly soliciting and allowing false testimony from its witness [Dkt. No. 1-1 at 3]; and

(2) withholding exculpatory information. [Id. at 2].

## II. Exhaustion and Procedural Default

"[A] federal court may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000). In order to meet the exhaustion requirement, a petitioner "must have presented to the state court 'both the operative facts and the controlling legal principles.'" Kasi v. Angelone, 300 F.3d 487, 501-02 (4th Cir. 2002) (quoting Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997). The requirement that facts be exhausted is an important aspect of exhaustion under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA limits federal habeas "review under § 2254(d)(1) … to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011); see Muhammad v. Clarke, 2012 U.S. Dist. LEXIS 10129, *24 (E.D. Va. Ja. 26, 2012) (where a petitioner attempts to allege unexhausted facts, the federal court must defer to the state court's finding) (citing Kasi, 300 F.3d at 501-02; Pinholster, 563 U.S. at 182-83), appeal dismissed, 474 F. App'x 979 (4th Cir. 2012). Pinholster emphasized "that the record under review is limited to the record in existence at that same time — *i.e., the record before the state court*." Id. (emphasis added).[1] The Fourth Circuit found that the reasonableness of a state court decision is evaluated "'in light of the evidence presented in the

---

[1] Pinholster explained that

[w]hat makes the consideration of new evidence strange is not how "different" the task would be, but rather the notion that a state court can be deemed to have unreasonably applied federal law to evidence it did not even know existed. We cannot comprehend how exactly a state court would have any control over its application of law to matters beyond its knowledge.

563 U.S. at 183 n.3.

State court proceeding.'" <u>Porter v. Zook</u>, 898 F.3d 408, 443 (4th Cir. 2018) (quoting <u>Jones v. Clarke</u>, 783 F.3d 987, 991 (4th Cir. 2015)).

Even if a claim has been defaulted, a federal court may review it if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law" or a fundamental miscarriage of justice. <u>Vinson v. True</u>, 436 F.3d 412, 417 (4th Cir. 2005). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him ...." <u>Coleman v. Thompson</u>, 501 U.S. 7.

To establish cause, ordinarily a petitioner "can show that some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986). To show "prejudice," a petitioner must show an alleged constitutional violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982) (emphasis removed). A court need not consider the issue of prejudice in the absence of cause. <u>See</u> <u>Kornahrens v. Evatt</u>, 66 F.3d 1350, 1359 (4th Cir. 1995).

Roberts' response admits the state habeas petition he filed did not contain facts or claims but insists his amendments were proper under state law and that his claims are therefore properly exhausted, not defaulted, and are capable of review on the merits by this Court. [Dkt. No. 17 at 2-3]. Roberts assertion his claims and facts are properly exhausted is simply wrong.

While Virginia allows amendment of pleadings, an amendment requires leave of court, <u>See</u> Va. Sup. Ct. R. 1:8 ("No amendments shall be made to any pleading after it is filed save by leave of court."). Pleadings filed without leave of court are "without legal efficacy" and a court does "not acquire jurisdiction to adjudicate any causes of action alleged in" a motion filed without leave of court. <u>Mechtensimer v. Wilson</u>, 431 S.E.2d 301, 302 (Va. 1993); <u>see, e.g.,</u> <u>Ahari</u>

v. Morrison, 654 S.E.2d 891, 892 (Va. 2008) (an amended complaint is not deemed filed until

the trial court grants leave to amend); see also Strong v. Johnson, 495 F.3d 134, 139 (4th Cir.

2007) (indicating that, absent leave of court, only two pleadings are permitted in an "original

jurisdiction habeas corpus case: a verified petition and a responsive pleading"). With regard to

habeas petitions, leave of court is required and a motion to amend must be filed prior to the

expiration of the statute of limitations and prior to any ruling on the merits. Va. Sup. Ct. R.

5:7(e). Roberts belated amendment was clearly not proper under Virginia law and his argument

to the contrary is, in essence, that the Supreme Court of Virginia erred in applying state law. His

argument is meritless. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the

province of a federal habeas court to reexamine state-court determinations on state-law

questions."); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (citing cases for the proposition that

"federal habeas corpus relief does not lie for errors of state law"); see also Sigmon v. Stirling,

956 F.3d 183, 193 (4th Cir. 2020) ("claims of error occurring in a state post-conviction

proceeding cannot serve as a basis for federal habeas corpus relief.") (citing Bryant v. Maryland,

848 F.2d 492, 493 (4th Cir. 1988)); Richardson v. Branker, 668 F.3d 128, 141 (4th Cir. 2012)

("When a claim of ineffective assistance of counsel raised in a habeas corpus petition involves an

issue unique to state law ... a federal court should be especially deferential to a state post-

conviction court's interpretation of its own state's law.").

Further, Roberts ignorance of law and procedure do not constitute cause to excuse his

default.

> A "petitioner's alleged lack of knowledge must be due to a lack of reasonable
> access to the rules," rather than "from basic ignorance of the rules or the law."
> Watson v. State of New Mexico, 45 F.3d 385, 388 (10th Cir. 1995); see also
> Bonilla v. Hurley, 370 F.3d 494, 498 (6th Cir. 2004) (concluding that petitioner's
> pro se status and ignorance of law and procedural requirements do not establish
> cause for excusing procedural default).

7

Williams v. Clarke, No. 1:18cv1541, 2020 U.S. Dist. LEXIS 48973, *10 (E.D. Va. Mar. 18, 2020), appeal dismissed, 818 F. App'x 296 (4th Cir. 2020).

To the extent Roberts arguments may be construed to allege his convictions constitute a miscarriage of justice, such a claim requires establishing "a constitutional violation [that] has probably resulted in the conviction of one who is 'actually innocent' of the substantive offense." Richmond v. Polk, 375 F.3d 309, 323 (4th Cir. 2004) (citation and internal quotation marks omitted). A convincing claim of actual innocence "may allow a prisoner to pursue his constitutional claims ... on the merits notwithstanding the existence of a procedural bar to relief." McQuiggin v. Perkins, 569 U.S. 383 (2013). This exception applies only in a "severely confined category"—that is, cases in which reliable new evidence shows that "it is more likely than not that 'no reasonable juror' would have convicted" the petitioner had the evidence been available at trial. Id. at 392 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).

Because Roberts has not presented any new evidence to establish a claim of actual innocence, his arguments do not satisfy the rigorous requirements of McQuiggin, and do not suffice to allow federal review of his procedurally defaulted claims. See Munchinski v. Wilson, 694 F.3d 308, 338 (3d Cir. 2012) (impeachment evidence generally not sufficient to satisfy an actual innocence claim based on newly discovered evidence) (citing Schlup, 513 U.S. at 324); Sparrow v. Dir., Dep't of Corr., 439 F. Supp. 2d 584, 588-89 (E.D. Va. 2006) (rejecting fundamental miscarriage of justice argument when petitioner "introduce[d] nothing new, but present[ed] instead a selective version of the facts and omit[ted] those facts belying his actual innocence claim"); see also Sawyer v. Whitley, 505 U.S. 333, 349 (1992) ("[L]atter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear

and convincing showing that no reasonable juror would have believed the heart of the [witness's] account.").

### III. <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012)

<u>Martinez</u> recognized a "narrow" exception that allows a federal court to excuse a state default to consider claims of ineffective assistance of trial counsel. This narrow exception is inapplicable to Roberts' claims, however, because "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." <u>Id.</u> at 14. All of Roberts' claims of ineffective assistance of counsel are not "substantial."

To establish ineffective assistance of counsel, a petitioner must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defendant." <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). Such a determination "must be highly deferential," with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689; <u>see also</u> <u>Burket v. Angelone</u>, 208 F.3d 172, 189 (4th Cir. 2000) (stating that a reviewing court "must be highly deferential in scrutinizing [counsel's] performance and must filter the distorting effects of hindsight from [its] analysis"); <u>Spencer v. Murray</u>, 18 F.3d 229, 233 (4th Cir. 1994) (opining that a court must "presume that challenged acts are likely the result of sound trial strategy."). The two prongs of the <u>Strickland</u> test are "separate and distinct elements of an ineffective assistance claim," and a successful petition "must show both deficient performance and prejudice." <u>Id.</u> at 233. Therefore, a court need not review the reasonableness of counsel's performance if a petitioner fails to show prejudice. <u>Quesinberry v. Taylor</u>, 162 F.3d 273, 278 (4th Cir. 1998).

*A. Claim A(1)*

In claim A(1), Roberts alleges his counsel was ineffective in preparing for trial because he did not obtain a copy of the search warrant affidavit Wright submitted in support of the application for the search warrant issued to search the residence where Roberts lived. Roberts identifies three instances where he alleges Detective Wright's testimony was inconsistent with the affidavit.

The first point concerns the issuance of an email alert. At trial, while Wright was explaining how the National Precursor Log Exchange (NPLEx) tracks all purchases of pseudoephedrine in real time at trial, he mentioned that NPLEx can send out email alerts to NPLEx users to allow a user (such as Wright) to watch for activity of the targets of their investigation. (6/14/2016 Tr. at 72). As an example, Wright testified that he got an email that indicated two targets were purchasing pseudoephedrine at a CVS on Garrisonville Road in Stafford County, about two minutes after the purchase was made. (Id.).[2] Wright testified that one of the targets was Kimberly Reynolds, but could not remember the other target. (Id.).

A short time later, Wright was asked about the "two targets that" he received "real-time *alerts* on." (Id. at 74) (emphasis added). When Wright began to testify about accessing NPLEx records, trial counsel objected. The trial judge heard argument and overruled the objection, and found the testimony and NPLEx records admissible. (Id. at 75-77).[3] Continuing with his testimony, Wright's testified that Reynolds was "one of the people that" he had received "one of those instantaneous *alerts* on [his] cell phone" during the investigation. Wright then testified

---

[2] The NPLEx records establish this purchase was at 10:42 p.m. on May 17, 2015. (Comm. Ex. 2 at 1). The NPLEx records also establish that Aaron Webb purchased pseudoephedrine at a CVS on Garrisonville Road in Stafford County at 10:45 p.m. (Comm Ex. 5 at 1).

[3] Roberts' NPLEx records were admitted. There were 61 entries, 31 purchases and 30 blocks. (Id. at 81).

after reviewing his affidavit, that "Roberts was the other party." (Id. at 83) (emphasis added).
Roberts claims the portion of the affidavit Wright used to refresh his recollection reads as
follows:

> On May 17, 2015, Norman Roberts, Kimberly Beazley both purchased
> pseudoephedrine from separate locations in the Fredericksburg area and Aaron
> Webb attempted a purchase but was blocked by NPLEX. Norman's purchase was
> conducted at the Giant pharmacy in the city of Fredericksburg at 1:19 PM while
> Kimberly Reynolds was conducted at the CVS located at 394 Garrisonville Rd at
> 10:42 PM. Aaron Webb attempted his purchase at the same CVS store at 10:45
> PM, but was blocked from the purchase.

[Dkt. No. 1 at 19]. Roberts argues that what Wright testified to at trial was a "different version"
than what was set forth in the affidavit. Roberts ignores the language of the question before his
counsel's objection and the subsequent answer, both of which are significant because the
question asks about two targets that Wright had received *alerts* (plural) on from NPLEx, and the
eventual answer again refers to "alerts."

It is not clear, however, that Wright provided a "different version" as Roberts contends,
because the question asked about "alerts" and Wright's used the plural "alerts" in his eventual
answer. Moreover, even if this were a material point—which it is not—the jury was not misled
because it had the NPLEx records that clearly established that Roberts and Reynolds were not at
the CVS at 10:42 p.m. on May 17, 2015; and that Aaron Webb was the person with Reynolds at
the CVS.[4]

Roberts next alleges that trial counsel should have impeached Wright regarding his
testimony at trial on surveillance. On cross-examination, Wright testified that on "one particular
night we followed *them* to multiple locations in Caroline County and Spotsylvania. We followed
them to the CVS at Cosner's Corner right there at Spotsylvania Parkway and Route 1, where we

---

[4] The NPLEX records establish that Webb was at the CVS on Garrisonville Road at 10:45 p.m. on May 17, 2015.
(Comm. Ex. 5 at 1).

actually observed Mr. Beazley purchasing pseudoephedrine from behind the counter." (Id. at

119) (emphasis added). Wright testified that there were four people in the car – Beazley,

Gaumer, Reynolds, and a fourth person he could not identify. (Id. at 122). Wright checked his

notes, and he could not testify as to the date, but did testify that he never saw Roberts go into a

store to purchase pseudoephedrine. (Id. at 123). Roberts contends that Wrights trial testimony

was inconsistent with the following portion of his affidavit.

> After watching 5411 Dew Ln for several hours during one particular operation,
> your Affiant observed three subjects exit the residence and get into a silver in
> color Honda Civic that is registered to Timothy Beazley. The vehicle left the
> residence headed north onto Rt 1 toward the Thornburg area of the county. Your
> Affiant with assistance from some additional surveillance units followed the
> vehicle to the 7-11 store located at Jefferson Davis Hwy and Mudd Tavern Rd.
> While there, two of three occupants went into the store after parking at the fuel
> pumps.

[Dkt. No. 1 at 17]. Wright's affidavit continues stating that he was able to identify Roberts as one

of the persons that went into the 7-11 store. The vehicle then went to a CVS store in Cosner's

Corner. Roberts argues that Wright had testified that he had only seen Roberts at the house and

that the number of occupants changed from four to three. Roberts argument ignores the

obvious—it would not have been to Roberts advantage to challenge Wright's testimony that

Wright had never seen Roberts go into a store to purchase pseudoephedrine. Wright's testimony

about not seeing Roberts purchase pseudoephedrine was consistent with the defense pursued at

trial.

The third instance of alleged potential impeachment involves surveillance of the house on

Dew Lane. At trial, Wright testified that on one occasion he had observed Roberts walking back

and forth with a plastic bottle in his hand shaking the contents in a manner consistent with the

"one-pot" cooking method of making methamphetamine. (6/14/2016 Tr. at 171-72). Roberts

relies on the portion of the affidavit in which Wright referred to the persons he saw walking

around the property as "male subjects" [Dkt. No. 1 at1 17], and from this reference Roberts argues Wright "couldn't tell who it really was." [Dkt. No. 1 at 50]. Roberts ignores that the purpose of the affidavit was to support the issuance of a search warrant to enable the police to search and seize evidence of a crime at the property, and not an arrest warrant to seize a specific person.[5] If this point had have been raised at trial, it would have simply provided the prosecution an opportunity to emphasize that Wright identified Roberts as the person shaking the bottle by the high-powered binoculars he was using and limited defense counsel's ability to cast doubt on which resident was shaking the bottle.[6]

The Court has already noted several obvious reasons why theses alleged acts of ineffectiveness have no merit, but the most obvious reason is that impeaching Wright would have been inconsistent with the defense—which was to use Wright to introduce evidence that supported Roberts argument that he was not the "cook." At trial, the record establishes that the defense pursued was that Roberts was not the "cook," *i.e.*, the person at the house where Roberts and several others lived that actually manufactured the methamphetamine.

Prior to trial, Roberts sent several letters to trial counsel about his defense at trial, a defense that would rely in part on Wright's testimony. In a letter prior to his arraignment, Roberts noted that Detective Wright's testimony from the preliminary hearing did not "point to" him. [Dkt. No. 1-1 at 11]. To that end, on February 9, 2016, Roberts sent a letter to trial counsel that included a number of questions to ask Wright, which included—the neatness of Roberts room in comparison to the others who lived in the house; the lack of water and the need to store

---

[5] Deputy Haney testified at trial as well and he testified that during the surveillance, he observed Roberts "walking around on the property with a bottle in is hand, shaking the bottle as he walked back-and-forth pacing around the yard." (Id. at 221).

[6] Counsel did address the surveillance in closing argument and noted the similarities between Roberts and two others present during the surveillance. (Id. at 394-95).

water in bottles to explain bottles in Roberts room; cold packs that would point to others as being

the guilty parties; and to establish that Wright had never seen Roberts purchase pseudoephedrine.

[Id. at 13-14].[7] Roberts subsequent letters indicate that the defense he wanted to present relied in

part on Wright's testimony. [Id. at 22-23; Dkt. No. 1-2 at 6-1]. In a May 9, 2016 letter, Roberts

repeated the expected testimony from Wright to establish others were the likely manufacturers

and also indicated that Roberts had decided to testify because he noted that he would testify that

his "ID" had gone missing, which was to be used to challenge the NPLEx records the

prosecution intended to use to establish Roberts had purchased pseudoephedrine. [Dkt. No. 1-2 at

1]. See Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined

or substantially influenced by the defendant's own statements or actions.").

In align with the defense, trial counsel's cross-examination of Detective Wright elicited

testimony that

- Roberts' room was neat and orderly compared to the rooms of others who lived at the house (6/14/2016 Tr. at 102);
- the cold packs found in Roberts room (which contain a precursor – ammonium nitrate – used in manufacturing methamphetamine) were unused and not stored with other precursors (Id. at 103-04);
- the pseudoephedrine found in the house was found in Beazley's room (Id. at 105-06);
- on the day of the execution of the search warrant most of the materials collected were outside and Roberts cooperated, spoke with Wright, and denied being part of the methamphetamine operation (Id. at 107, 114);
- Wright had never seen anyone who was a "cook" make such a high number pseudoephedrine purchases associated with Roberts driver's license reflected in the NPLEx records (Id. at 111-12);
- the big spoon found in Beazley's room was used in cooking and Beasley had the fewest number of pseudoephedrine purchases, which were spaced out so he was never blocked and could avoid detection (Id. at 112-13);
- Wright never saw Roberts go into any stores to purchase pseudoephedrine when he was surveilling persons after they left the house (Id. at 123);

---

[7] Roberts' hubris in bringing the present claim goes beyond hypocrisy in that Roberts alleges his trial counsel should have impeached Wright's testimony on one of the very points that Roberts directed counsel to use in his defense.

- the items found in Webb's former room – such as sludge, a waste product of cooking; and a knife, funnel, and pliers – were indicative of items that could be used in preparing to cook and cooking (Id. at 199, 201-02); and
- discarded bottles were found outside Webb's room and where surveillance photo show Webb standing.

Trial counsel used Wright's testimony from cross-examination in closing argument to point to Beazley as the cook and not Roberts. (Id. at 381-83).

"There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689; see Harrington v. Richter, 562 U.S. 86, 107 (2011) ("Counsel [i]s entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."). Here, trial counsel used the prosecutor's primary law enforcement witness to introduce evidence consistent with the defense's theory at trial. Trial counsel was not ineffective for the manner in which he cross-examined Wright. See Smith v. Angelone, 111 F.3d 1126, 1132-33 (4th Cir. 1997) (finding no deficient performance where trial counsel "made a tactical decision" "to rely upon cross-examination of the State's own witnesses" "to build his theory of the case"); see also Williams v. Kelly, 816 F.2d 939, 950 (4th Cir. 1987) ("Counsel is not ineffective merely because he overlooks one strategy while vigilantly pursuing another.").

Roberts decided on a trial strategy that depended in part on Wright's testimony. After that strategy failed Roberts, in hindsight, now seeks to question that trial strategy and alleges that counsel should have impeached Wright. Sallie v. N. Carolina, 587 F.2d 636, 640 (4th Cir. 1978) (finding that cross-examination is a matter of trial strategy that cannot be second-guessed in a collateral habeas proceeding); see also Hoots v. Allsbrook, 785 F.2d 1214, 1219 (4th Cir. 1986) ("[C]ourts considering a claim of ineffective assistance should not second-guess strategic

decisions of counsel."); United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature" and do not ordinarily support an ineffective assistance claim). Higgs v. United States, 711 F. Supp. 2d 479, 515 (D. Md. 2010) ("Defense counsel constantly must decide what questions to ask and how much time to spend on a particular witness. These are precisely the types of tactical decisions a court is not supposed to second guess."); cf. Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.").

Further, Roberts argues that these three points of alleged inconsistency show that Wright perjured himself at trial. Roberts argument is incorrect. "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony," United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987), and "[p]erjury consists of false testimony concerning a material matter, 'given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory).'" Horton v. United States, 983 F. Supp. 650, 657 (E.D. Va. 1997). "Inasmuch as the allegation of perjury arises merely from inconsistent trial testimony, counsel did not act deficiently in failing to raise it at any point in the proceeding." Alonzo v. United States, Case No. 2:02-1456, 2006 U.S. Dist. LEXIS 10551, *5 (S.D. W. Va. Feb. 27, 2006); see Mark v. Dretke, Case No. H-05-2546, 2006 U.S. Dist. LEXIS 47174, *25 (S.D. Tex. June 30, 2006) (petitioner failed to show that witness actually committed perjury because conflicting or inconsistent testimony is insufficient to establish perjury and therefore trial counsel's performance was not deficient under Strickland for not objecting to the testimony).

Moreover, there is nothing material in Roberts first point about different versions as to what happened on May 17, 2015. The NPLEx records verify Roberts, Reynolds, and Webb's purchases. (Comm. Ex. 1 at 1; 2 at 1; and 5 at 1). Further, at best, Wright might have been confused as to the targets upon who he received an email alert.[8] The only material point is the information contained in the NPLEx records, which corroborate the affidavit and the material points of Wright's testimony.

In addition, Roberts second two points do not establish inconsistency, much less perjury. The fact that Wright did not name the persons observed shaking the bottles in the affidavit does not equate to an inconsistency. Likewise, it is of little import that Wright saw Roberts at some point away from the house on Dew Lane. Wright himself acknowledged that he saw Roberts at a traffic stop where Roberts was a passenger.

Roberts examination of Wright was in accordance with the defense pursued at trial and Roberts has failed to state a claim of ineffective assistance of counsel under either prong of Strickland v. Washington.

*B. Claim A(2)*

In claim A(2), Roberts alleges that counsel was ineffective in preparing for trial by failing to investigate recorded jailhouse call evidence that was used against Roberts. Roberts argues that trial counsel's ineffectiveness allowed "prejudicial evidence to be admitted when he advised petitioner to testify" and the jury never would have heard the recordings. [Dkt. No. 1 at 54]. Roberts premise, that but for his testimony the recordings would not have been admissible, is simply wrong.

---

[8] Roberts has not shown that Wright did not get email alerts on both Roberts and Reynolds on May 17, 2015, only that it is unlikely he received a "real-time" alert for both at the same time.

Initially, Roberts does not posit upon what grounds his statements could have been excluded. A habeas petitioner must set forth the objection counsel should have raised. Kimmelman v. Morrison, 477 U.S. 365, 382 (1986) ("a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim like respondent's, [but] a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief"). The defendant's telephone calls included relevant admissions with regard to the indictments and were admissible regardless of whether he testified or not. In Virginia, "[e]xtra-judicial admissions that tend to show guilt, even if not confessions, are admissible as party admissions." Paden v. Commonwealth, 529 S.E.2d 792, 793 (Va. 2000) (citing Prince v. Commonwealth, 324 S.E.2d 660, 662 (Va. 1985));[9] see United States v. Williams, 760 F. App'x 959, 963 (11th Cir. 2019) (holding statements that a defendant made in recorded jailhouse telephone call were admissible as admissions of a party-opponent); see also United States v. Wills, 346 F.3d 476, 489 (4th Cir. 2003) (a defendant's own statements constitute "admissions by a party-opponent and [are] admissible pursuant to" Federal Rule of Evidence 801(d)(2)(A)).

Further, Roberts does not explain how his attorney could have discovered the calls prior to trial.[10] The statements are not exculpatory, and the statements on the calls were not made to law enforcement officers and therefore not discoverable under Virginia Rule 3A:11(b)(1), which

---

[9] Roberts admissions included "buying methamphetamine from a neighbor," telling "his girlfriend he was glad she had not been involved in the offense because she did not have any photo identification and that he and the others were caught because they were "buyin' 'em and buyin' 'em and buyin' 'em;" that he "knew what was going on" and "was getting high or whatever;" that he "had thrown his life away 'for basically nothing;'"" and that he should get a lower charge because there was "only like 80 grams ... in the soda bottle." Roberts, 2017 Va. App. LEXIS 276, *5.

[10] There were three phone calls on the disc introduced into evidence. Each was about 15 minutes long. At the approximately one-minute mark on each recording, a message plays before the participants begin to speak. The message notifies the participants that the call is being placed from a "correctional facility and is subject to monitoring and recording." Roberts, therefore, knew that his statements had been recorded. If he had informed his counsel of that fact, his counsel could have been better prepared to address the statements the prosecutor introduced. Once the recordings were made, Roberts statements were admissible if the prosecution elected to use them. Any fault lies with Roberts and not his counsel.

only requires disclosure of statements made to law enforcement officers. See, e.g., Brown v. Commonwealth, 813 S.E.2d 557, 580 (Va. Ct. App. 2018) (statement made in open court at arraignment was admissible and not required to be provided in discovery because the statement was not made to a law enforcement officer). Roberts knew he had made the telephone calls and that the calls were monitored and recorded, and yet still indicated he intended to testify in his own behalf. The petitioner's lies on the witness stand, not counsel's failure to review the phone calls, led to the petitioner's impeachment at trial. Roberts has not established that his counsel was ineffective under either prong of Strickland v. Washington.

   C. Claim A(3)

   In claim A(3), Roberts asserts that counsel was ineffective when he failed to prepare for trial by failing to investigate the NPLEx records used as evidence against the petitioner. The record does not support Robert's argument.

   Counsel was aware of the NPLEx records prior to trial as evident by the fact that he was prepared to and did object to their admission at trial. (Tr. 6/14/2016 at 74-77).[11] In addition, the Court of Appeals held, on Roberts' direct appeal, "We assume without deciding that the [NPLEx] records were not admissible but find that the error was harmless given the other overwhelming evidence in the case that established appellant's guilt." Roberts, 2017 Va. App.

---

[11] Roberts assertion that witnesses and surveillance videos from the stores would show that someone else used his ID. Roberts, however, has not produced any witnesses or videos to support his assertion of evidence that counsel failed to uncover and introduce. See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990) (failure to identify witnesses and/or the substance of their testimony does not establish ineffective assistance of counsel). "[A]n allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced." Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996). "When a petitioner's ineffective assistance of counsel claim rests on trial counsel's failure to call particular witnesses, expert or otherwise, we require 'a specific proffer ... as to what an expert witness would have testified.'" Vandross v. Stirling, 986 F.3d 442, 452 (4th Cir. 2021) (citation omitted).

LEXIS 276 at 6-7.[12] Roberts has not established that his counsel was ineffective under either prong of Strickland v. Washington.

### D. Claim A(4)

In claim A(4), Roberts alleges that counsel was ineffective for failing to do basic legal research and possess knowledge of law that pertains to the petitioner's case. Specifically, Roberts claims that a witness for the Commonwealth, Detective Wright, misstated the law and counsel failed to correct him.

Detective Wright testified that pharmacists are required by law "to look" at the photo identification of anyone purchasing ephedrine. The Code of Virginia specifically says, "Any person purchasing, receiving, or otherwise acquiring ephedrine or related compounds shall, prior to taking possession, present photo identification issued by a government or an educational institution." Va. Code § 18.2-265.7 (C) (emphasis added). The statute also requires a pharmacy or retail distributor to "maintain a written log or electronic system with the purchaser's name and address, birth date, and signature; the product name and quantity sold; and the date and time of the transaction." Va. Code § 18.2-265.7 (D). Section 18.2-268 (A)(6) requires the pharmacy or retail stores system to "provide for the recording of the ... The date and time of the transaction ... [and] [t]he name, address, date of birth, and photo identification number of the purchaser; the type of identification; and the government or educational institution of issuance...." The pharmacy or retail distributor cannot comply with the statutory scheme unless the person selling or distributing the pseudoephedrine "looks" at the photo ID and records the required information

---

[12] Aaron Webb's testimony at trial, which was supported and corroborated by the admissions Roberts made in the calls, established that Roberts "was making" methamphetamine by using Sudafed and putting it in a bottle and cooking it. (6/14/16 Tr. at 136). Roberts was "cooking it" because he was the "only one that knew how to do it." (Id. at 137). Webb purchased pseudoephedrine, gave it to Roberts and Roberts would cook it by shaking the bottle, which Webb saw him do "many times. (Id. at 139).

from the photo ID. Wright did not misstate the law, and his attorney was not ineffective for making a futile objection. See United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992) (in order to state a claim of ineffective assistance of counsel for failure to raise an objection at trial, a habeas petitioner must first show that a valid objection existed); Thomas v. United States, 951 F.2d 902, 904 (8th Cir. 1991) (same); and United States ex rel. Link v. Lane, 811 F.2d 1166, 1169-70 (7th Cir. 1987) (no prejudice from counsel's failure to object to statement by officer because the alleged objection "on the merits is unsupportable"). Roberts has failed to establish a claim under either prong of Strickland v. Washington.

### E. Claim B(1)

In this claim, Roberts relies upon the alleged perjured testimony about the email alerts in Claim A(1). As noted therein, Roberts did not establish Wright committed perjury. See supra at 10-13, 16-17. This claim has no merit.

### F. Claim B2

In Claim B(2), Roberts alleges the Commonwealth withheld exculpatory evidence from him, specifically the affidavit submitted in support of the search warrant. Roberts admits in the petition that he obtained a copy of the affidavit by writing the Clerk at the circuit court. (Cir. Ct. R. at 448-51). His own admission establishes that the affidavit was not withheld. See United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990) ("where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady[13] doctrine."); see also Barnes v. Thompson, 58 F.3d 971, 975 n.4 (4th Cir. 1995) (noting that "Brady requires that the government disclose only evidence that is not available to the defense from other sources, either

---

[13] Brady v. Maryland, 373 U.S. 83 (1963).

directly or through diligent investigation"). Roberts was aware a search warrant had been executed as was his counsel. Roberts claim has no merit.

## IV. Conclusion

For the foregoing reasons, respondent's Motion to Dismiss [Dkt. No. 10] is granted and this petition will be dismissed with prejudice. n appropriate Order and judgment shall issue.[14]

Entered this ___10___ day of ___May___ 2021.

Alexandria, Virginia

/s/ ___
Liam O'Grady
United States District Judge

---

[14] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n. 4 (1983)). Herrera fails to meet this standard.